UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------
UNITED STATES OF AMERICA        :
                                :
         v.                     :  Criminal No.:  3:15-cr-00077 (SRU)
                                :
BARCLAYS PLC,                   :  December 1, 2016
                                :
         Defendant.             :
------------------------------------------------------------

# UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE

The United States respectfully submits this memorandum in aid of sentencing and in support of the Plea Agreement entered into between the United States and Barclays PLC (the "Defendant"), a global financial services company.  On May 20, 2015, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Defendant waived indictment and pleaded guilty to a one-count information charging it with violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  Sentencing in this matter is scheduled for December 15, 2016.

The United States and the Defendant agree that a criminal fine in the amount of $650 million, a period of probation of 3 years, no order of restitution, and a $400 special assessment, is a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§ 3553(a), 3572(a).  The Probation Office has also stated in its evaluation that the proposed sentence meets these purposes.  *See* Presentence Report (November 16, 2016) ¶ 98.  The Defendant has cooperated extensively with the investigation giving rise to this matter.  For the reasons set forth below, the United States respectfully moves for a downward departure from

the Defendant's Sentencing Guidelines fine under U.S.S.G. § 8C4.1 and requests that the Court accept the Defendant's guilty plea and sentence the Defendant in accordance with the Plea Agreement between the United States and the Defendant, which was previously filed with the Court.

I. **Summary of the Offense**

The Defendant entered into and engaged in a conspiracy, which began at least as early as December 2007 and continued until at least January 2013, to fix, stabilize, maintain, increase and decrease the price of, and rig bids and offers for, the euro/U.S dollar ("EUR/USD") currency pair exchanged in the foreign currency exchange spot market ("FX Spot Market"), by agreeing with its co-conspirators to eliminate competition in the purchase and sale of the EUR/USD currency pair. The Defendant participated in this conspiracy through two of its EUR/USD traders, who communicated on a near-daily basis with traders employed by the Defendant's co-conspirators in an electronic chat room known by some in the FX Spot Market as "the Cartel" or "the Mafia" (the "Cartel Chat"). The Defendant employed a trader who participated in the Cartel Chat from at least December 2007 until July 2011, while a second trader employed by the Defendant participated from December 2011 until at least August 2012.

The conspiracy charged in the Information affected the price of the EUR/USD currency pair, which is the most heavily traded currency pair in the FX Spot Market. This market is a global, over-the-counter market, which operates 24 hours a day during the business week, in which currencies are exchanged for one another. Each currency has a price, which can change continuously throughout the day, often on a second-by-second basis.

The Defendant and its co-conspirators are "dealers" in the FX Spot Market. Dealers are crucial to the market, providing two key functions: they quote prices to potential customers and,

if the customer accepts the dealer's quote, the dealer agrees to sell currency to, or buy currency from, the customer. A dealer's customers can include corporations, asset managers, or other entities requiring foreign exchange. Dealers also trade with one another in a segment of the market known as the "interdealer" market, which is akin to a wholesale market where a dealer can go to find the currency it needs to fill customer orders, among other things. A dealer bears the risk of price changes in the market, but can profit off of the trades it makes.

There is no "closing price" of a currency. Therefore, in order to provide a reference for a currency's price, "fixes" are calculated at certain times of the day. Fixes provide a price snapshot at a specific time. The fix rate is published and disseminated throughout the market and used as a price benchmark, as well as in pricing certain financial products. There are two fixes for the EUR/USD currency pair primarily at issue in this matter: the 1:15 PM (London time) European Central Bank fix ("ECB fix") and the 4:00 PM (London time) World Markets/Reuters fix ("WMR fix"). As a dealer, the Defendant executes currency trades during these fixing times. These trades contribute to the calculation of the fix rate.

Acting through certain traders who participated in the Cartel Chat, the Defendant and its co-conspirators agreed not to compete with one another at certain ECB and WMR fixes. Such conduct was central to the charged conspiracy and, as discussed below, the calculation of the fine agreed to by the parties. The conspirators carried out this agreement by, among other things, coordinating their trading strategies at certain fixes. This coordination, at times, allowed the conspirators to attempt to move the fix price up or down, in order to potentially benefit their trading position. Such conduct, however, could have impacted certain customers of the conspirators, by potentially causing certain customers to pay for currency at a price which could have been lower, or sell currency at a price which could have been higher, absent the conspiracy.

As set forth in the Plea Agreement, the Defendant also engaged in other currency trading and sales practices in conducting FX Spot Market transactions with customers via telephone, email and/or electronic chat. Such relevant conduct related to how the Defendant handled certain limit orders, how the Defendant at times applied sales markup, and the disclosure of certain non-public information. *See* Plea Agreement ¶ 16.

## II. Legal Standard

Rule 11(c)(1)(C) authorizes the United States to enter into plea agreements with parties in which the parties agree that a particular sentence is the appropriate disposition of the case. *See* Fed. R. Crim. P. 11(c)(1)(C). The Court, however, "retains absolute discretion whether to accept a plea agreement." Fed. R. Crim. P. 11, Advisory Committee notes to 1999 amendments. As a plurality of the Supreme Court has observed:

> Federal sentencing law requires the district judge in every case to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, in light of the Guidelines and other [18 U.S.C.] § 3553(a) factors. The Guidelines provide a framework or starting point – a basis, in the commonsense meaning of the term – for the judge's exercise of discretion. Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but the agreement does not discharge the district court's independent obligation to exercise its discretion.

*Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (internal citations and quotation marks omitted). In exercising that discretion, while the district court may accept or reject the proposed Rule 11(c)(1)(C) plea agreement, it may not modify the agreement's terms. *Id; United States v. Green,* 595 F.3d 432, 438 (2d Cir. 2010) (citing *United States v. Cunavelis*, 969 F.2d 1419, 1422 (2d Cir. 1992)).

## III. Sentencing Guidelines

Due to the size of the FX Spot Market, a key consideration in calculating the fine involves the procedure required when the guidelines fine is greater than the statutory maximum

fine for the charged offense. As discussed below, the following provisions are relevant to the fine calculation here: 1) the instructions for calculating a fine under Chapters Eight and Two of the Sentencing Guidelines; 2) the statutory maximum fine for the offense under 15 U.S.C. § 1 and 18 U.S.C. § 3571 (c) and (d); and 3) the instructions in U.S.S.G. § 8C3.1(b) pertaining to instances where the minimum guidelines fine is greater than the statutory maximum fine.

Organizations, such as the Defendant, are sentenced pursuant to Chapter 8 of the Sentencing Guidelines. In the case of antitrust violations, in addition to the provisions of Chapter 8, special instructions with respect to determining fines for organizations are applicable pursuant to U.S.S.G. § 8C2.4(b). The relevant special instruction states that for organizations "in lieu of pecuniary loss under subsection (a)(3) of § 8C2.4 (Base Fine), use 20 percent of the affected volume of commerce." U.S.S.G. § 2R1.1(d)(1). After calculating the base fine, the organization's culpability score is determined pursuant to U.S.S.G. § 8C2.5, which is used to select the minimum and maximum fine multipliers that are then used to determine the applicable fine range. *See* U.S.S.G. § 8C2.6. In the case of antitrust violations, however, the special instructions applicable to fines for organizations state that neither the minimum nor maximum multiplier shall be less than 0.75. U.S.S.G. § 2R1.1(d)(2).

In determining the volume of commerce affected by the conspiracy, the United States focused on conduct by the Defendant involving the ECB and WMR fixes. Such conduct had significant anti-competitive effects in the market. It also provided some of the most complete and accessible trade data, allowing for a fair and expeditious resolution to this matter. A review of the Defendant's total volume of transactions at ECB and WMR fixes during the conspiratorial period, prorated by 50%, so that the Defendant and its co-conspirators are not held accountable for their collective losses, and prorated further to account for the years in which the Defendant

was active in the conspiracy, yields a volume of affected commerce of $1.98 trillion. Thus, using 20% of the volume of affected commerce under U.S.S.G. § 2R1.1(d)(1) would result in a base fine of $396 billion that exceeds the maximum statutory penalty of $100 million, even when using a minimum multiplier of 0.75. Pursuant to U.S.S.G. §§ 8C3.1(b), when the minimum guideline fine is greater than the maximum fine authorized by statute, the maximum fine authorized by statute shall be the guideline fine. While the Sherman Act only authorizes a fine for corporations up to $100 million, 15 U.S.C. § 1, the alternative fine provision nonetheless authorizes a fine equal to twice the gain derived from the offense or twice the loss caused to the victims, if any person derives pecuniary gain from the offense or if the offense results in pecuniary loss to a person other than the defendant, 18 U.S.C. § 3571(c)-(d), which is the case here.

  The United States used the loss associated with the conspiracy to calculate the proposed fine in this matter pursuant to U.S.S.G § 2R1.1 cmt. n. 3, which states: "[t]he loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices." In order to determine pecuniary loss, the United States analyzed the effect the Defendant and its co-conspirators had on the EUR/USD price for a selection of ECB and WMR fixes. Using price data provided by the Defendant and its co-conspirators, the United States analyzed how the EUR/USD price changed for ECB and WMR fixes during the time period between 2009 and 2012, the years for which data was available. This analysis measured price changes over windows of 30 seconds, 60 seconds and 120 seconds. The United States observed a range of price changes, with the mean and median effects varying each year. Given this, the United States concluded that a price

movement of approximately .03% of a USD cent was reasonable to use in order to determine the gross pecuniary loss associated with the conspiracy.

Given the .03% estimate, the loss resulting from Defendant's conduct was determined to be $593 million.  The Defendant does not contest this calculation for the purposes of this sentencing.  *See* Plea Agreement ¶ 12(f).  Doubling the $593 million loss yields a statutory maximum fine of $1.186 billion. 18 U.S.C. § 3571(c)-(d).  Since $1.186 billion is the maximum fine authorized by statute, $1.186 billion becomes the Guideline fine pursuant to U.S.S.G. §§ 8C3.1(b).

### IV.     Statutory Factors to Consider at Sentencing

In addition to considering the Guidelines in effect on the day of sentencing, the Court must also consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572 in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet specified sentencing goals.  The most relevant factors include: 1) the history and characteristics of the Defendant and the nature and circumstances of the offense (18 U.S.C. § 3553 (a)(1)); 2) the need for the sentence imposed to reflect the seriousness of the misconduct, to promote respect for law, to provide adequate deterrence, and to protect the public from other crimes of the Defendant (18 U.S.C. § 3553 (a)(2)(A – C)); and 3) the Defendant's measures to prevent recurrence of the offense and to discipline employees responsible for the offense (18 U.S.C. § 3572(a)(8).  The United States submits that the proposed sentence contained in the Plea Agreement is sufficient, but not greater than necessary, to achieve these objectives.

#### 1. History and Characteristics of the Defendant and the Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The Defendant is a financial services company with offices worldwide, and with approximately 130,000 employees.  In June 2012, the Defendant agreed to pay a $160 million

fine and enter into a non-prosecution agreement with the United States to resolve violations arising from the Defendant's submissions for the London InterBank Offered Rate (LIBOR) and the Euro Interbank Offered Rate (EURIBOR), which are benchmark interest rates used in financial markets around the world. The United States found that the Defendant's misconduct occurred from 2005 through 2007 and then occasionally from 2007 through 2009.

This course of events is obviously concerning and, as part of the non-prosecution agreement with the United States, the Defendant admitted and accepted responsibility for its misconduct involving both LIBOR and EURIBOR submissions.  Importantly, when reaching the resolution with the Defendant the United States specifically recognized the Defendant's extraordinary cooperation in the LIBOR and EURIBOR investigation, noting that the Defendant made timely, voluntary and complete disclosure of its misconduct, including the disclosure of relevant facts that at the time were not known to the United States.  The Defendant began implementing new compliance controls in the wake of its June 2012 non-prosecution agreement. These included a prompt review of employees' use of chats, resulting in the implementation of new guidance on chat use and, eventually, their prohibition in certain contexts.  Nevertheless, the Defendant acknowledges that certain conduct giving rise to the instant charge pertaining to the FX Spot Market continued for a few months during the pendency of the non-prosecution agreement it reached in resolution of LIBOR.  As a result, as part of the instant Plea Agreement, the Defendant agreed to pay an additional $60 million criminal penalty for this violation of the non-prosecution agreement, separate and apart from any fine imposed for its misconduct in the FX Spot Market.  *See* Plea Agreement ¶¶ 9-11.

The charged offense affected an important market in the global economy, continuing for a number of years undetected.  By agreeing not to compete with each other, the Defendant and

its co-conspirators, at times, increased the likelihood that they would profit, despite the potential effect on other market participants.  Ultimately, the conspiracy was carried out by a small group of traders in organizations collectively employing hundreds of thousands of people.  And when the Defendant became aware of the conduct, it promptly began cooperating with the United States.  While the Defendant committed a serious offense, it has accepted responsibility and has taken significant steps to remedy the conduct.

### 2. Seriousness of the Misconduct, Respect for Law, and Deterrence (18 U.S.C. § 3553(a)(2)(A))

Antitrust conspiracies are by their very nature serious offenses.  According to the background comments in the antitrust guideline, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm."  U.S.S.G. § 2R1.1 cmt. backg'd.  The conspiracy charged in the Information affected one of the largest and most important markets in the global economy, continuing for a number of years and impacting market participants in the United States and throughout the world.  Because of the seriousness of the offense the United States has insisted on substantial monetary penalties.  The Defendant has also made changes to its compliance programs, to ensure that the charged conduct does not recur.  But the United States also recognizes that the conduct, while serious, was limited to a small part of the Defendant's operations.  This conduct involved two traders who, while invested with significant responsibility in connection with the Defendant's role as a dealer in the FX Spot Market, was not a member of the Defendant's senior management.

The significant criminal fine of $650 million recommended in resolution of this matter provides deterrence to similar conduct and promotes respect for law.  The criminal fine, if approved by the Court, will be among the largest fines ever imposed for an antitrust violation.

Fines of this magnitude deter similar wrongdoing.  Yet the proposed fine is proportionate and reasonable, given the fact that the Defendant has also resolved with other regulatory authorities, and paid substantial monetary penalties.  Moreover, by charging the parent-level organization, the proposed resolution demonstrates that the United States will hold corporations responsible for the conduct of all of its employees, when appropriate.  This will similarly deter future misconduct by employees in large organizations.   Finally, the Defendant's unequivocal acceptance of responsibly for its conduct promotes a respect for law and serves as a positive example for others.

### 3. Measures to Protect the Public from Further Crimes of the Defendant and to Prevent Recurrence of the Offense and Discipline of Employees Responsible for the Offense (18 U.S.C. §§ 3553(a)(1)(C), 3572(a)(8))

Although certain shortcomings in the Defendant's compliance program allowed the conduct charged in this matter to continue for a period during the pendency of the non-prosecution agreement the Defendant entered into in resolution of LIBOR, the Defendant has made significant improvements to its compliance program since that time.  The Defendant has now undertaken dramatic steps to change its corporate culture and instill a new attitude toward compliance and good corporate citizenship.  Of particular note, the Defendant replaced its senior management with a new management team that, from the outset, emphasized the importance of compliance and remediation.  This message was matched by action.  And this action began soon after the Defendant became aware of the conduct, making the Defendant a leader in its efforts towards remediation.  Specifically, the Defendant initiated a worldwide review of its governance, operational model, and risk and control programs.  This review was a truly comprehensive undertaking, involving the detailed examination of existing documentation governing controls and management, as well as the extensive review of external resources pertaining to regulatory

guidelines and industry reports.  The Defendant also devoted substantial efforts to responding to and incorporating feedback from its employees and stakeholders, interviewing over 600 such stakeholders and considering over 9,000 responses to an internal staff survey.  As a result of this review, the Defendant has implemented changes to its organizational structure, including making its Legal and Compliance functions independent of the business.  Importantly for this case, the Defendant has changed its FX operations in a manner designed specifically to address the conduct at issue in this matter.  These changes include new controls on communications, especially concerning the use of chat rooms, as well as an expanded effort to monitor electronic communications.  The Defendant made many of these changed on its own initiative, before entering into any resolutions with various regulators required remedial actions.

    The significant delay in sentencing that has resulted from related regulatory process has given the United States an extended opportunity to assess the efficacy of the Defendant's efforts.  The United States has begun to see significant and sustained results of the Defendant's efforts to change its business and compliance culture, based on the United States' ongoing communications with the Defendant and by observing its approach to proactively seeking out and addressing potentially problematic conduct.  In particular, the United States notes the Defendant's extraordinary dedication to the timely reporting of potential misconduct.  While it is the case that the Defendant, along with the other related defendants in this matter, must report certain conduct to the Antitrust and Criminal Divisions as a condition of probation, the Defendant has treated these reporting obligations as if they were mandatory despite not yet being on probation and subject to these requirements.  In sum, the Defendant's commitment to compliance and remediation has been exemplary and effective, and its transparency in reporting to the United States is commendable.

Finally, the Defendant took remedial steps designed to assess the involvement of any employees in the offense, and to discipline any determined to be involved. The individuals responsible for the offense are no longer employed by the Defendant.

### V.     **Probation and Restitution**

Pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years. In considering whether to impose a term of probation the Court should consider the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3562. The Court should also consider the factors in U.S.S.G. § 8D1.1 that set forth the circumstances under which a sentence to a term of probation is required.

Pursuant to the Plea Agreement, the parties have agreed to recommend that the Court impose a term of probation of 3 years. During the term of probation, the Defendant has agreed, among other things, to report credible information regarding violations of U.S. antitrust law, as well as U.S. law concerning fraud, including commodities and securities fraud. The Defendant has also agreed to report, in certain contexts, investigations involving the Defendant conducted by other governmental authorities. The full conditions of probation proposed by the parties are set forth in Paragraph 9 (c) of the Defendant's Plea Agreement.

Pursuant to 18 U.S.C. § 3563(b)(2), the Court may order the Defendant to pay restitution. The potential victims in this matter have available a number of civil causes of action, which potentially provide for a recovery of a multiple of the actual damages caused by the charged conduct. In light of the availability of these civil causes of action, the parties have agreed not to recommend that the Court impose an order of restitution. The Defendant has already made significant efforts to pay restitution to potential victims by settling certain private actions relevant to this matter.

## VI.     Motion for Substantial Assistance Departure

The Defendant provided timely, useful and substantial assistance to the United States' investigation into conduct in the FX Spot Market. In consideration of the factors under 18 U.S.C. §§ 3553(a) and 3572 as discussed above, and for the reasons set forth below, pursuant to U.S.S.G. § 8C4.1, the United States moves for a downward departure to reduce the Defendant's guidelines fine to $650 million.

### 1.  The Significance and Usefulness of the Assistance

The United States' wide-ranging investigation into conduct in the FX Spot Market involved the review of enormous volumes of electronic and telephonically recorded conversations collected over a number of years, the interviews of hundreds of witnesses, and the analysis of complex trade data detailing substantial FX transactions, and involving entities throughout the world. For over a year and half leading to the proposed resolution, the Defendant provided information to assist the investigations conducted by both the Antitrust Division and the Criminal Division. This cooperation continues to this day.

In its investigations into antitrust conspiracies, the United States relies heavily on the cooperation of insiders, because such conspiracies are inherently secretive. This is especially true in this case, in which much of the evidence of the conduct was contained in an exclusive chat room which could only be viewed by the chat participants themselves. As an added complexity, the communications in this chat room were often filled with dense jargon, describing highly technical trading strategies, and conveyed frequently in shorthand. The Defendant provided valuable assistance by explaining how the FX Spot Market operates, and by defining and decoding certain jargon traders use when describing their actions in the market, sometimes via a line-by-line review of chat transcripts. This allowed the United States to more effectively

13

question witnesses during its investigation, and helped guide the analysis of the evidence obtained. Moreover, while the EUR/USD currency pair is the focus of the charges in this matter, when the investigation began the United States examined conduct in multiple currencies, involving a number of different chat rooms. The Defendant's assistance helped narrow the scope and focus of the investigation.

The Defendant produced large amounts of trade data to the United States. This data was of critical importance to the United States, because it was used, in part, to quantify the harm caused by the conduct in determining the appropriate fine. But the relevant trade data was itself also important evidence of the conduct since, in many instances, the data corroborated statements made by the traders in the Cartel Chat. The Defendant's cooperation was uniquely helpful in this respect. Over the course of a number of lengthy meetings with the United States, the Defendant presented its analysis of its own trade data for specific days of interest to the United States. These presentations required hundreds of hours of work by the Defendant, resulting in a detailed integration of data, chat transcripts from multiple chat rooms, and audio files memorializing telephone calls of interest. This information allowed the United States to better assess the import of specific conduct in the market.

The Defendant also provided significant and useful assistance by bringing certain evidence to the attention of the United States concerning a potential antitrust conspiracy in the FX Spot Market, separate from the conspiracy charged in the Information, and involving different currencies. This cooperation involves obtaining information from witnesses; producing and explaining relevant documents, audio files, and trade data; and conducting numerous factual presentations on the conduct at issue. The United States has an ongoing investigation into this conduct, which the Defendant has significantly advanced through its cooperation.

## 2. The Nature, Extent and Timeliness of the Assistance

The Defendant, which was the second entity to begin cooperating with the investigation, provided timely and extensive assistance.  This cooperation involved responses to numerous requests from both the Antitrust and Criminal Division, which often required the Defendant to quickly and simultaneously provide information about different conduct of interest to the different Divisions, involving different groups of employees, in various business functions.  In addition, the Defendant undertook a period of accelerated cooperation at a critical phase of the investigation, which included a massive effort to focus on specific conduct relating to the Defendant's sales practices.

The Defendant diligently reviewed and produced substantial amounts of documents and audio filed to the United States.  Many of the documents were particularly important to the investigation because they related to conduct occurring early on in the conspiracy.  That the Defendant was able to produce such early documents is a reflection of the timeliness of its cooperation.  All told, the Defendant reviewed 8.6 million documents from 187 custodians.  Often, the Defendant identified documents it believed may have been of interest to the United States.  The Defendant's cooperation allowed the United States to effectively manage its review and use of documents.  In addition, the Defendant assisted the investigation through a comprehensive and labor intensive review and production of audio files.  The Defendant's system retaining these files presented certain technical challenges to review and production, but the Defendant preserved, reviewing over 100,000 audio files.  The Defendant also took the additional step of identifying which among these many files might be relevant to the United States' investigation.

The Defendant also played an important role in assisting the United States identify potential witnesses, both through the Defendant's production of documents as well through the Defendant's own efforts to interview witnesses. When necessary, the Defendant sought information from witnesses multiple times, conducting 84 interviews of 63 individuals in London, New York and the Asia-Pacific region. This assistance allowed the United States to focus its investigation by identifying those witnesses most likely to have relevant information.

The detailed factual presentations made by the Defendant provided the United States with a deeper understanding of the conduct at issue. For instance, the Defendant brought to the United States' attention a particular iteration of the Cartel Chat unknown to the United States at the time, ultimately clarifying the scope of the communications between the traders involved. The Defendant also provided comprehensive information on certain conduct in the FX Spot Market, which the United States considered in determining the proper charges to bring in this matter. The 38 substantive presentations made by the Defendant were in addition to its regular reporting by the Defendant about the status of its investigation. During these regular reports, the Defendant promptly provided information requested by the United States, in a coherent manner. The Defendant also repeatedly accepted feedback about its investigation, so that the Defendant could respond meaningfully to the needs of the United States' investigation.

Finally, the Defendant has been proactive in bringing to the attention of the United States certain potentially problematic conduct, unknown to the United States, involving FX-related financial products that were not the focus of the investigation into FX Spot Market. It would have been exceptionally difficult for the United States to uncover such conduct without the Defendant's assistance. All told, the Defendant voluntarily disclosed conduct in 9 separate instances, often meeting with the United States multiple times to discuss the conduct at issue.

The Defendant provided substantial assistance to the investigation. This assistance was timely, useful, and extensive. The Defendant has made notable strides in taking remedial action to ensure that the charged conduct does not recur, and has proactively brought other potentially problematic conduct to the United States' attention. The Defendant's cooperation made an important contribution to a swift resolution with three separate defendants. A downward departure from the Defendant's Sentencing Guidelines fine is therefore appropriate.

## VII. Recommendation

Pursuant to the 11(c)(1)(C) Plea Agreement between the United States and the Defendant, the United States requests that the Court depart downward from the Defendant's Sentencing Guidelines fine, and recommends that the Court impose: a fine of $650 million, payable in full before the fifteenth day after the date of judgment; a period of probation of 3 years, with the conditions set forth in the Plea Agreement; no order of restitution; and a $400 special assessment. This sentence is sufficient but not greater than necessary to meet the goals set forth in 18 U.S.C. §§ 3553(a) and 3572.

Respectfully submitted,

*/s/ Bryan C. Bughman*
BRYAN C. BUGHMAN
ERIC L. SCHLEEF
GEORGE S. BARANKO
ERIC C. HOFFMAN
LEAH GOULD
DAVID CHU

Trial Attorneys
U.S. Department of Justice
Antitrust Division

## CERTIFICATION OF SERVICE

      This is to certify that on December 1, 2016, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

      BY:    */s/ Bryan C. Bughman*
                 BRYAN C. BUGHMAN
                 Trial Attorney
                 U.S. Department of Justice
                 Antitrust Division